## NATIONAL LIFE & ACCIDENT INS. CO. v. HARRIS.

### No. 3817.

Court of Civil Appeals of Texas. Beaumont.
March 7, 1941.

Rehearing Denied March 19, 1941.

Sonfield & Sonfield, of Beaumont, for appellant.

Sharfstein, Bell, Weinert & Nelson, of Beaumont, for appellee.

WALKER, Justice.

On the 12th day of July, 1921, appellant, the National Life & Accident Insurance Company, issued to Hyman Harris three policies of insurance in the principal amount of $10,000 the premiums payable in quarterly installments of $89.11 on the 12th day of July, October, January and April of each year. On each of the policies was attached the following rider:

"Total and Permanent Disability.

"In consideration of the continuance of Policy No. 6139 on the life of Hyman Harris, the Company agrees to pay for the Insured the premiums thereafter becoming due thereon, if the Insured, before attaining the age of sixty years, after paying at least one full annual premium and before default in payment of any subsequent premium, shall furnish satisfactory proof to the Company at its Home Office, accepted by it in writing, that he has become wholly and permanently disabled by bodily injury or disease, so that he is and will be for life continuously and wholly prevented thereby from performing any work or transacting any business, for compensation or profit, or from following any gainful occupation. Premiums so paid by the Company shall continue said Policy in force, and all values therein provided shall increase, in the same manner and to the same extent as if paid by the Insured, shall constitute no lien or indebtedness against the Policy, and shall not be deductible from any settlement thereunder. * * *"

Hyman Harris died in August, 1934, and appellant promptly paid to appellee, Fannie Harris, wife of the deceased and independent executrix of his estate, the principal amounts of the three policies.

This case was tried to the court without a jury, and the following facts from the court's conclusions of the facts give the nature of the suit: On the 12th day of February, 1931, Hyman Harris became totally and permanently disabled within the coverage of the total and permanent disability rider, which disability continued until the death of Hyman Harris. By reason of his disability, resulting from disease, Hyman Harris was not able to transact any business, nor to attend to any of his per-

sonal business; he was not able to make the quarterly payments on his life insurance policies. We give the following fact conclusions by the court:

"5. During such period of disability I. G. Harris, son of Hyman Harris, upon the instruction of his father, undertook the management and complete control of all of his father's affairs and business, both general and personal, and thereafter for the balance of his father's life had sole and complete control and management thereof to the exclusion of all knowledge and interest on the part of his father, Hyman Harris, the latter being in fact wholly incapable of attending thereto.

"6. In such capacity, I. G. Harris paid out of funds of Hyman Harris to the defendant quarterly premium payments upon premium notices transmitted by defendant and received by I. G. Harris, as of date February 12, 1931, in the amount of $89.11, and the same amount on subsequent premium notices on each of the following dates: May 12, 1931, August 11, 1931, November 12, 1931, February 13, 1932, May 6, 1932, August 9, 1932, November 12, 1932, February 10, 1933, May 10, 1933, and August 12, 1933, being the total sum of Nine Hundred and Eighty and 21/100 Dollars ($980.21).

"7. From immediately prior to February 12, 1931, all transactions with reference to such insurance policies and the payment of premium thereon was handled between I. G. Harris and the defendant herein, both with relation to the payment of same and the ultimate discovery of premium waiver by I. G. Harris, upon information from defendant's agent, Wingate, the said Hyman Harris having no part nor knowledge of such transactions.

"8. Prior to the furnishing of information to the said I. G. Harris by defendant's agent, Wingate, immediately before date of November 12, 1933, I. G. Harris had no knowledge of the existence of any type of premium waiver provisions generally in any form of life insurance policy, and first learned of such from defendant's agent, Wingate.

"9. During the period of payment of premiums by I. G. Harris, the policies of insurance were not in his control or possession but were in a private lock drawer of his father's safe, from which same were obtained only by breaking into such drawer upon and after being advised by defend-

ant's agent Wingate that such policies might contain premium waiver provisions.

"10. During the period of payment of premiums by I. G. Harris after the occurrence of disability, because of the serious illness and dangerous physical condition of his father, and the natural delicacy of relationship of father and son, I. G. Harris refrained from discussing the insurance policies with his father and did not mention same nor the payment of premiums thereon, nor did he feel justified in seeking access thereto prior to learning of the possibility of premium waiver provisions existing and being attached to such policies.

"11. Hyman Harris had no knowledge of the payment of premiums after occurrence of his disability.

"12. Such payments of premiums were made by I. G. Harris without actual knowledge by him or by his father, Hyman Harris of the existence of the premium waiver provisions and the right to waiver of premium thereunder upon the insurance policies of Hyman Harris.

"13. On or immediately prior to November 12, 1933, I. G. Harris furnished satisfactory proof to the defendant at its home office accepted by it in writing, that Hyman Harris immediately prior to February 12, 1931, became wholly and permanently disabled by bodily injury or disease so that he was for life continuously and wholly prevented thereby from performing any work or transacting any business, for compensation or profit, or from following any gainful occupation.

"14. Defendant accepted such proof in writing and waived the payment of premiums commencing November 12, 1933, continuing the policies of insurance in force until death of Hyman Harris in August, 1934.

"15. Immediately prior to November 12, 1933, I. G. Harris made demand on defendant for refund of premiums paid, commencing February 12, 1931, to and including August 12, 1933, and defendant refused to return such premiums and still refuses to return same upon demand of the legally qualified executrix of the estate of Hyman Harris, the said Mrs. Fannie Harris, plaintiff in this suit."

On the facts, the court made the following conclusions of law: (a) The furnishing of proofs under the total and permanent disability rider was "a condition sub-

sequent," to be performed within a reasonable time after the occurrence of the disability; (b) I. G. Harris furnished appellant proof in writing within a reasonable time after the occurrence of the disability; (c) I. G. Harris paid the quarterly premiums under a mistake of fact as to the existence of the premium waiver; appellant suffered no change of position to its prejudice by reason of the fact that I. G. Harris paid the premiums; (d) "Payer received no benefit as a result of making the payment, nor will receive any by return thereof, to which he was not otherwise entitled as a matter of law"; (e) "Proof of disability having been made within a reasonable time, defendant was not, at law or in equity, entitled to the premiums after the occurrence of disability"; and (f) appellee "as the qualified executrix of the will of Hyman Harris, deceased, is entitled to recover such payment of defendant together with interest thereon at the legal rate of 6% per annum from date of receipt of each payment by defendant to date of repayment of such amount to plaintiff".

This action was by appellee to recover the premiums paid by I. G. Harris, on his father's account, which matured from February 12, 1931, the date of the beginning of his father's disability, to November 12, 1933, the date appellant was furnished proof of his father's disability. The appeal was prosecuted by appellant from the judgment in favor of appellee for the amount of the premiums paid, with interest at six percent per annum, totalling $1,455.61.

### Opinion.

On the facts found by the court, the law supports its conclusions of law.

 As read by a layman, Minnesota Mutual Life Ins. Co. v. Marshall, 8 Cir., 29 F.2d 977, 978, an ambiguity appears on the face of the total and permanent disability rider, whether the phrase "thereafter becoming due" thereon, refers to the time when the disability began or to the time of the furnishing of the proof of disability. This ambiguity invokes the following rule announced by the Supreme Court of the United States in Bergholm v. Insurance Co., 284 U.S. 489, 52 S.Ct. 230, page 231, 76 L.Ed. 416, page 419: "where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted." In State Life Ins. Co. v. Barnes, 58 S.W.2d

189, 190, construing a premium waiver, in its legal effects on all fours with the premium waiver now at issue, the Austin Court of Civil Appeals, Mr. Chief Justice McClendon writing the opinion, said, citing the supporting authorities: "While the authorities in other jurisdictions are not in accord upon the question, those in this state, which we think are supported by the better reasoning, hold that the waiver took effect at the time of the disability, and did not depend upon the time when proof thereof was furnished."

So, the furnishing of the proof of disability was a condition subsequent, and not a condition precedent. In this connection, we make the following additional quotation from Judge McClendon's opinion in the Barnes case: "Further comment we think unnecessary, except to add that, if appellant, the author of the language of the policy, had intended to make the notice and proof of liability a condition precedent to effectiveness of the waiver, apt unequivocal language to that effect was available and should have been employed."

As supporting our construction of the premium waiver, we cite the following additional authorities: Bank of Commerce & Trust Co. v. Northwestern Nat. Life Ins. Co., 160 Tenn. 551, 26 S.W.2d 135, 68 A.L.R. 1380; Commonwealth Cas. & Ins. Co. v. White, Tex.Civ.App., 142 S.W.2d 633; Garrison v. Great Southern Life Ins. Co., Tex.Civ.App., 72 S.W.2d 692; Missouri State Life Ins. Co. v. LeFevre, Tex.Civ.App., 10 S.W.2d 267; National Standard Life Ins. Co. v. Smith, Tex.Civ.App., 75 S.W.2d 1102; Pan-American Life Ins. Co. v. Welsh, Tex.Civ.App., 74 S.W.2d 408; Southland Life Ins. Co. v. Gatewood, Tex.Civ.App., 115 S.W.2d 723, affirmed, 135 Tex. 177, 141 S.W.2d 588, Com.App. opinion adopted by Sup.Ct.

Appellant has cited many authorities in support of its proposition that the furnishing of the proof of disability was a condition precedent. These authorities may be distinguished on the following grounds: (1) Contrary to the construction by the Texas courts of premium waivers, certain of appellant's authorities seem to hold that all conditions requiring the furnishing of proof should be construed as conditions precedent. See Goldman v. New York Life Ins. Co., 115 N.J.Eq. 535, 171 A. 541, and the authorities cited therein; Courson v. New York Life Ins. Co., 295 Pa. 518, 145 A. 530; Yohalem v. Columbian Nat.

Ins. Co., 136 Misc. 748, 240 N.Y.S. 666; Epstein v. Mutual Life Ins. Co., 143 Misc. 587, 257 N.Y.S. 772; Franklin Life Ins. Co. v. Fisher, 164 Okl. 193, 23 P.2d 151. (2) In certain other cases the language of the premium waiver makes clear the intent of the contracting parties that the furnishing of proof of disability should be a condition precedent. In Brotherhood of Ry. Trainmen v. Dee, 101 Tex. 597, 111 S.W. 396, 398, the policy contained the following provision: "But such written notice shall be a condition precedent to the brother's rights under this section."

See also Burns v. American Nat. Ins. Co., Tex.Com.App., 280 S.W. 762, 764; Commercial Union Assur. Co. v. Preston, 115 Tex. 351, 282 S.W. 563, 45 A.L.R. 1016; Scottish Union & Nat. Ins. Co. v. Clancy, 71 Tex. 5, 8 S.W. 630; Southern Surety Co. v. Aronson, Tex.Civ.App., 5 S.W.2d 629; Bank Savings Life Ins. Co. v. Milan, Tex.Civ.App., 70 S.W.2d 294; Jefferson Standard Life Ins. Co. v. Williams, Tex.Civ.App., 62 S.W.2d 661; Metropolitan Life Ins. Co. v. Wann, 130 Tex. 400, 109 S.W.2d 470, 471, 115 A.L.R. 1301; Federal Surety Co. v. Smith, Tex.Com. App., 41 S.W.2d 210, 213. (3) In other cases no proof was furnished prior to the trial of the case or proof was not duly furnished: Metropolitan Life Ins. Co. v. Wann, 130 Tex. 400, 109 S.W.2d 470, 471, 115 A.L.R. 1301; Bank Savings Life Ins. Co. v. Milan, Tex.Civ.App., 70 S.W.2d 294; Jefferson Standard Life Ins. Co. v. Williams, Tex.Civ.App., 62 S.W.2d 661. (4) A more liberal construction of the premium waiver rider, as against the construction of the disability benefit provision of a health and accident policy. This distinction is illustrated by State Life Ins. Co. of Indianapolis v. Parks, 89 S.W.2d 289, 290, where the Amarillo Court of Civil Appeals, distinguishing the Barnes Case, said: "Waiver of premium payments and forfeiture of the policy were the controlling questions, not liability, as here, for monthly benefit payments to one still living upon receipt of proof of disability."

See also State Life Ins. Co., etc. v. Parry, Tex.Civ.App., 88 S.W.2d 763.

Against the court's fact conclusions sustaining the furnishing of proof of disability, under the total and permanent disability rider, appellant advances the following propositions:

■ (1) The disability began on February 1, 1931, but no proof of disability was furnished until immediately prior to November 12, 1933, thirty-three months delay. Appellant's proposition is that "such delay in furnishing such proof of disability is unreasonable as a matter of law." This contention is denied. The evidence raised the issue, found by the court in its conclusions of fact, that Hyman Harris, from and after the 12th day of December, 1931, was totally and permanently disabled to attend to any business whatever. Neither appellee nor her son, I. G. Harris, who attended to his father's furniture business subsequent to February 12, 1931, knew that these premium waivers had been attached to his father's policies of insurance, and there was no circumstance in the record giving him notice of these premium waivers. In fact, he did not know that life insurance policies could carry premium waivers; his first knowledge of such premium waivers was given to him by appellant's own agent, at the time stated by the court in its fact conclusions. The authorities cited by appellant in support of this proposition are not in point. In State Life Ins. Co. of Indianapolis v. Parks, Tex.Civ.App., 89 S. W.2d 289, 290, the court said: "Here the appellee was able to go about and attend to some business."

State Life Ins. Co. of Indianapolis v. Parry, supra, Connecticut Gen. Life Ins. Co. v. Warner, Tex.Civ.App., 94 S.W.2d 514, Lewis v. Connecticut Gen. Life Ins. Co., Tex.Civ.App., 94 S.W.2d 499, were cases where judgments were sought for the benefits of the policies, and not on the issue of premium waiver; these cases fall within the fourth ground of distinction discussed above.

■ (2) Appellant asserts that there was no evidence that I. G. Harris acted for his father, the insured, "in any capacity other than as a mere volunteer in making such payments or that there was any mistake of fact on the part of insured." This contention is overruled. I. G. Harris testified (Q. & A. reduced to narrative):

"I recall my father's physical condition during the beginning of the year 1931. All the last of 1930 he was still getting worse, stayed in bed more often than he was up; from the beginning of '31 he was in bed almost, I would say, three weeks out of every four weeks. My father did nothing around the store from that period on. He became inactive in the store from the last part of 1930. From that time on I was in active charge of the store (Hyman Har-

ris was in the furniture business in Beaumont prior to his disability). My father came to the store at intervals. We got him to ·come to the store to get his mind off the pains he was in, trying to build up his resistance; trying to make him think he was better and getting along better. We didn't discuss with him business matters of any kind. He wouldn't stand for it; he wouldn't listen; he would just stand around in the store and look, and then go to another place. He made no suggestions to me about buying for the store or in relation to any other business of the store. We would tell him sometimes something, but he would just say 'Use your own judgment'; wouldn't try to make any suggestions. From the time my father became inactive in the latter part of 1930 until he died he did no labor whatever. I signed all the checks and did all the buying and everything else that he used to do. When he first got sick, he gave me instructions with reference to his business; he told me to carry the business on like he was, and take care of all the bills that came due and payable, sign the checks and take care of all bills. He never did check up with me to see whether I was following his instructions or not; he left it all in my charge. During the time I was in the charge of my father's business I had knowledge of the premium notices on these insurance policies. The only thing I can tell you is that when the premiums came due through the mail, I put them on my desk and at the time they were due I paid them. I paid these premiums by check, and these checks were charged back to my dad's personal account. My dad did not discuss these policies with me. Dad was very close mouthed about his own personal business, and, of course, being his son, I never did delve into his own personal business; he was awful close mouthed about it; I never did ask him anything about it, and he didn't tell me anything about it. During the time I looked after my father's business, the policies were at that time in a drawer in the safe, that was his own personal drawer, that he had his own key to, and no one ever went into that drawer—not even myself. During the time I was paying these premiums I had not examined the policies; the policies were my father's personal matters and I did not go into them. I did not make any attempt to discuss his policies with him. Dad was too sick a man to bring up anything about life insurance with him while he was sick. I wouldn't dare do anything like that, in the condition he was in."

(3) This being an action to recover premiums voluntarily paid by I. G. Harris, acting for his father, appellant asserts: "Where a voluntary payment is made under a mistake of fact, it is not recoverable back where the payee is misled or prejudiced by the mistake."

Appellant was in no way misled or prejudiced by the fact that I. G. Harris paid the premiums on his father's insurance policies.

(4) We give appellant's seventh proposition: "It is reversible error for a court before whom a cause is tried without the intervention of a jury to refuse to incorporate in its findings of fact all of the material issues and ultimate facts where, by written motion seasonably made, the omitted material issues and ultimate facts are brought to its attention."

Under this proposition, appellant contends that the court erred in refusing to make the following fact conclusions: "I find as a fact that from prior to February 12, 1931, until the death of Hyman Harris, he retained full management and control of his personal affairs and business and that the authority of I. G. Harris, the son of Hyman Harris, to attend to and look after his father's business was confined strictly and solely to the management of the furniture store and business, the only business in which Hyman Harris was interested."

"I find as a fact that from prior to February 12, 1931, until shortly after October 12, 1933, Hyman Harris was rational, had a good memory and was mentally competent to attend to his personal business."

There is in the record a statement of facts. A refusal of the court to·make the findings requested by appellant in no way prejudiced its right to complain of the insufficiency of the evidence to support the findings actually made by the court. In the case at bar, the court filed conclusions of fact and law, which distinguishes this case from the authorities cited by appellant. The court did not commit prejudical error in refusing to make findings on these issues. Wandry v. Williams, 103 Tex. 91, 124 S.W. 85; Galveston, H. & S. A. Ry. Co. v. Stewart & Threadgill, Tex.Com. App., 257 S.W. 526, 528; Barnett v. Barnett, Tex.Civ.App., 98 S.W.2d 215, 216. It

is also our construction of the evidence that the court was justified in refusing to make these fact findings.

The judgment of the lower court should be affirmed, and it is accordingly so ordered.

Affirmed.